**CONTINUATION IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Trisha M.A. Kovac, a Special Agent with the Federal Bureau of Investigation (FBI), being duly sworn, depose and state as follows:

**INTRODUCTION**

1.      I have been employed as a Special Agent ("SA") of the Federal Bureau of Investigation since February 1, 2009, and am currently assigned to the Detroit Division, Saint Joseph Resident Agency.  While employed by the FBI, I have investigated federal criminal violations related to high technology or cybercrime, child exploitation, and child pornography, and regularly assist in the prosecution of these types of cases.  I have received training in the area of child pornography and child exploitation and have had the opportunity to observe and review numerous examples of child pornography (as defined in 18 U.S.C. § 2256) in all forms of media including computer media.  Moreover, I am a federal law enforcement officer who is engaged in enforcing the criminal laws, including coercion and enticement and traveler offenses.  As a federal agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.  My duties include the investigation of alleged violations of federal criminal laws, including matters involving violations of 18 U.S.C. §§ 2251 and 2252A (which make it illegal to produce, distribute, and possess child pornography in interstate commerce) and of 18 U.S.C. § 2423 (which makes it illegal to travel in interstate commerce with the intent to engage in illicit sexual activity).

2.      Pursuant to the provisions of 18 U.S.C. § 2256(8), "child pornography" means a visual depiction, the production of which involves the use of a minor engaging in sexually explicit

conduct, including but not limited to various simulated or actual sex acts, or the lascivious exhibition of the genitals or the pubic area.

3.      This continuation is submitted in support of an application, under Rule 41 of the Federal Rules of Criminal Procedure, for a search warrant for the locations specifically described in Attachment A, including Snapchat accounts **jessy225827**, and **noregrets-cea1 ("Target Accounts")**.  There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, and/or fruits of these crimes further described in Attachment B.

4.      The statements contained in this continuation are based in part on information provided by U.S. federal law enforcement agents, written reports about this and other investigations that I have received, directly or indirectly, from other law enforcement officers, information gathered from investigative sources of information, and my experience, training, and background as a Special Agent.

5.      This continuation is submitted for the limited purpose of securing a search warrant. I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to believe that contraband and evidence, fruits, and instrumentalities of violations of federal law are located at the **Target Accounts.**

## FACTUAL BACKGROUND OF INVESTIGATION

6.      On or around April 14, 2023, 11:30 a.m., a woman herein referred to as W.J. contacted the Berrien Springs Oronoko Township Police Department to report that her 12-year-old daughter, herein referred to as J.R., had left the house after W.J. went to work at 5:00 a.m.

According to information obtained by J.R.'s sister from J.R.'s Snapchat account, J.R. went to meet a male in his twenties known only as "Jessy" to have sex in the woods for drugs.  At the time she went missing, J.R. was wearing a purple hoodie with neon-colored graphics of a skeleton hand holding a rose, and grey shorts.

7.      Afterward, J.R.'s sister found a video in J.R.'s Snapchat account, which is an account with username **noregrets-cea1**, that showed her having sex with a Hispanic male in the woods.  The video had been sent to J.R.'s Snapchat account from account **jessy225827**[1] that morning and was shot from the perspective of the male subject.  The video at first appeared to be in the "portrait" mode, and a male's face can be seen clearly.  The camera view then flips, and a close-up of intercourse of a penis penetrating a vagina is visible.  A female can be seen having her hair pulled while she is in the all-fours position from the male vantage point taking the video.  J.R.'s sister identified the female as J.R. based upon her physical appearance and the shirt she was wearing in the video.  A screen capture from the video showed the below subject:

---

[1] A preservation request was submitted to Snapchat for **noregrets-cea1** and **jessy225827** on April 18, 2023 and April 15, 2023, respectively.



8.     FBI was notified shortly after 4:00 pm that same day that J.R. was missing, and initiated a number of emergency disclosure requests to track her location and identify the subject. An emergency disclosure request submitted to Snapchat for **jessy225827** returned Google email account mtorres.12349@gmail.com and IP logs returning to Verizon Wireless.[2]   A search in Accurint[3] for mtorres.12349@gmail.com returned a match for an individual identified as EDUARDO G. TORRES, DOB xx/xx/1997,[4] residential address in Waukegan, IL.  An emergency disclosure request submitted to Google, LLC for mtorres.12349@gmail.com requesting all

---

[2] Snapchat is a visual social media messaging application operated by Snap Inc., a company located in Santa Monica, California.

[3] Accurint is a public record database that law enforcement routinely uses in investigations.

[4] The full date of birth is known to me, but I have not included it to protect personal identifying information.

account information, including subscriber and location information, provided location data that indicated that the account had traveled from outside Chicago, Illinois to Berrien Springs, Michigan from 1 a.m. to 4 a.m., spent time in the vicinity of J.R.'s address, then traveled towards Benton Harbor, MI, leaving at approximately 4:00 p.m. eastern time to return to Chicago.  The timing of the Google location data shows that the subject was in the vicinity of either Berrien Springs or Eau Claire, Michigan at the time Snapchat user **jessy225827** sent the video of sexual intercourse to J.R.'s Snapchat account.

9.     Google     returned     the     following     subscriber     information     for mtorres.12349@gmail.com:

> Eddie Torres
> Waukegan, IL
> 224-406-4664

The street address in Waukegan provided by Google matched the street address in Accurint, and the same phone number was also linked to TORRES in Accurint.

10.     The location history of the Google account was plotted onto maps by an FBI Special Agent from the Cellular Analysis Survey Team (CAST), which provided TORRES's travel history, as shown below:

Mtorres.12349@gmail.com
Google Location History
4/14/2023  1:00 AM to 3:00 AM



Mtorres.12349@gmail.com
Google Location History
4/14/2023  3:00 AM to 4:00 AM



Mtorres.12349@gmail.com
Google Location History
4/14/2023  4:00 AM to 8:00 AM



Mtorres.12349@gmail.com
Google Location History
4/14/2023  8:00 AM to 12:00 PM



-7-

Mtorres.12349@gmail.com
**Google Location History**
4/14/2023  12:00 PM to 4:00 PM



Mtorres.12349@gmail.com
**Google Location History**
4/14/2023  4:00 PM to 6:49 PM



-8-

11.     The FBI submitted an exigent request to Verizon for subscriber information for the cellular account number 224-406-4464.   This number was associated with EDUARDO G. TORRES both in Accurint and from the Google account information listing the subscriber as Maria Torres at the same address in Waukegan, IL.   According to the Chicago Department of Motor Vehicles, Maria Torres's DOB is xx/xx/1969.[5]   Law enforcement contacted Maria Torres at the Waukegan address and confirmed that she is TORRES's mother.   Location information provided by Verizon for cellular account number 224-406-4464 also showed the same path of travel as the Google account data showed.   A combined image of the Verizon and Google data shows both the Google account and the Verizon account located within the vicinity of J.R.'s residence between 4:00 a.m. and 6:00 a.m. on April 14, 2023:



---

[5] The full date of birth is known to me, but I have not included it to protect personal identifying information.

12.     As of 6:49 p.m. on April 14, 2023, the Google account gave the following location within the city of Waukegan, IL:



13.     An Illinois driver's license for EDUARDO G. TORRES shows an individual of similar appearance to the male from the video:



14.     From the late hours of April 14, 2023, to the early morning hours of April 15, 2023, cellular number 224-406-4464 continued to ping within the vicinity of the known Waukegan, IL address for EDUARDO G. TORRES.  In the early morning hours of April 15, 2023, Agents approached the residence and observed individuals outside of the residence who identified themselves as family members of TORRES.  TORRES and J.R. were seated in a vehicle in the driveway.

15.     Upon making contact with TORRES, Agents called 224-406-4464, and heard the phone ring in TORRES's pocket, which he picked up.  Agents seized the device, which was a Google Pixel 2 phone with IMEI 357536087171205 and S/N: FA7BH1A00357, Model G011A. Google Pixel phones are not manufactured in Michigan.  Agents read TORRES his *Miranda* rights and interviewed him.  TORRES admitted that he was communicating with J.R. on Snapchat with the purpose of driving to Michigan to see her to engage in sexual intercourse.  He stated that he

had not met her in person prior to April 14, 2023.  TORRES admitted that he traveled to Michigan to pick up J.R. and that he had sexual intercourse with J.R. twice, including once in the woods near J.R.'s residence in Berrien Springs, Michigan.  TORRES stated that he waited until J.R.'s mother left for work to pick up J.R.  After TORRES and J.R. had sexual intercourse, he admitted that he drove her across state lines to his home in Waukegan, Illinois.

16.     Additionally, TORRES admitted to producing three videos of himself and J.R. having sexual intercourse and that he sent those videos to J.R.'s Snapchat account.  A portion of one of the videos has been recovered by law enforcement after J.R.'s sister located the video (described above) on J.R.'s Snapchat account.  TORRES admitted that he believed that J.R. was 13 years old.  TORRES admitted that he had a laptop at his residence on which he had viewed child sexual abusive materials in the past.  Agents also seized the computer.  He further admitted to talking to others who he believed were minors on Snapchat and stated that J.R. was the first he had met in person.  Based on the location data evidence, the Snapchat video evidence, and TORRES's statements, including that the first time he met J.R. in person was on April 14, 2023, the video of sexual intercourse was produced in Berrien County in the Southern Division of the Western District of Michigan when he had sex with J.R. in the woods near her residence.  TORRES was subsequently arrested.

17.     On April 15, 2023, the government filed a criminal complaint against TORRES for violations of 18 U.S.C. §§ 2251(a) (production of child pornography); 2252A(a)(5)(B) (possession of child pornography); 2423(a) (transportation of a minor); and 2423(b) (travel with intent to engage in illicit sexual activity).  (1:23-mj-00162-RSK PageID.2).

-12-

18.     Based upon the aforementioned information, I respectfully submit there is probable cause to search Snapchat accounts **jessy225827** and **noregrets-cea1** for evidence regarding TORRES's travel in interstate commerce with intent to engage in illicit sexual activity in violation of 18 U.S.C. § 2423(b), and the production and possession of child pornography in violation of 18 U.S.C. §§ 2251(a) and 2252A(a)(5)(B), respectively.

## BACKGROUND ON CHILD PORNOGRAPHY, COMPUTERS, AND THE INTERNET

19.     Based on my training, experience, and information obtained from other agents, I know the below statements are accurate.

20.     Computers and digital technology are the primary way in which individuals interested in child pornography interact with each other.  Computers basically serve four functions in connection with child pornography: production, communication, distribution, and storage.

21.     Any computer can connect to any smartphone, tablet, or other computer. Through the internet, electronic contact can be made to millions of computers around the world. Child pornography can therefore be easily, inexpensively, and anonymously (through electronic communications) produced, distributed, and received by anyone with access to a computer or smartphone.

22.     The internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion. Individuals also use online resources to retrieve and store child pornography.

23.      Individuals commonly use smartphone and computer apps to receive, store, distribute, and advertise child pornography, to interact directly with other like-minded offenders

-13-

or with potential minor victims, and to access cloud-storage services where child pornography may be stored.

## CHARACTERISTICS COMMON TO INDIVIDUALS WITH A SEXUAL INTEREST IN CHILDREN

24.     Based on my knowledge, experience, and training in child exploitation and child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, there are certain characteristics common to individuals interested in a sexual relationship with children.  Characteristics common to people interested in having a sexual relationship with children include that they:

a.   Generally have a sexual interest in children and receive sexual gratification from viewing children engaged in sexual activity or in sexually suggestive poses, or from literature describing such activity.

b.   May collect sexually explicit or suggestive materials in a variety of media, including in hard copy and/or digital formats.  People with a sexual interest in children oftentimes use these materials for their own sexual arousal and gratification.  They may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse or groom a child to participate in sex, or to demonstrate the desired sexual acts.

c.   May also keep "trophies" or mementos of sexual encounters with children, or items that they use to gratify a sexual interest in children, such as by collecting children's underwear or other items belonging to a child.

d.   May take photographs that either constitute child pornography or indicate a sexual interest in children by using cameras, video cameras, web cameras, and cellular telephones.  Such

images and video may be taken with or without the child's knowledge.  This type of material may be used by the person to gratify a sexual interest in children.

e.  Generally, maintain their communication indicating a sexual interest in children and child pornography in a safe, secure, and private environment, most often where they live and/or on their person.  These images and videos can be downloaded onto desktop or laptop computers, computer disks, disk drives, data disks, system disk operating systems, magnetic media floppy disks, internet-capable devices, cellular telephones, tablets, digital music players, and a variety of electronic data storage devices (hardware, software, diskettes, tapes, CDs, DVDs, SD cards, memory cards, USB/jump/flash memory devices, external hard drives, and other digital storage media).  The images can be stored in both digital and hard copy format and are usually hidden so that they are not found by other members of the individual's family.

f.  May correspond with and/or meet others to share information and materials; rarely destroy correspondence from others with a sexual interest in children; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, screen names, and telephone numbers of individuals with whom they have been in contact and who share the same sexual interest in children.  Such correspondence may take place, for example, through online bulletin boards and forums, internet-based chat messaging, email, text message, video streaming, letters, telephone, and in person.

## **BACKGROUND INFORMATION REGARDING SNAPCHAT**

25.  Snapchat is a product offered by Snap, Inc. ("Snap"), a company headquartered in Santa Monica, California.  Snapchat is a free access social networking application (or "app") that

can be accessed at http://www.snapchat.com.  Snapchat is an application for sending and receiving "self-destructing" messages, pictures, and videos.  These messages are commonly referred to as "snaps."

26.     The following information has been provided to me by the Snapchat Law Enforcement Guide, published by Snap Inc., which was updated on September 29, 2020: "Snapchat is a mobile application made by Snap Inc. ("Snap") and available through the iPhone App Store and Google Play Store. The Snapchat app provides users a way to share moments with photos, videos, and chats."

27.     The Law Enforcement Guide defines Snapchat features as follows:

a)     Snaps:  Snaps are photos or videos taken using the Snapchat app's camera on an individual's mobile device, and may be shared directly with the user's friends, or in a Story (explained below) or Chat.  Snap's servers are designed to automatically delete a Snap after it has been opened by all intended recipients.  Snap's servers are designed to automatically delete an unopened Snap sent directly to a recipient after 30 days and an unopened Snap in Group Chat after 24 hours.

b)     Stories:  A user can add Snaps to their "Story".  A Story is a collection of Snaps displayed in chronological order.  Users can manage their privacy settings so that their Story can be viewed by all Snapchatters, their friends, or a custom audience.  A user can also submit their Snaps to our crowd-sourced service "Our Story", which enables their Snaps to be viewed by all Snapchatters in Search and Snap Map.  Snap's servers are designed to automatically delete a Snap in a user's Story 24 hours after the user posts the

Snap, but the user may delete part or all of the Story earlier.  Submissions to Our Story may be saved for longer periods of time.

c)      Memories:  Memories is Snapchat's cloud-storage service.  Users can save their sent or unsent Snaps, posted Stories, and photos and videos from their phone's photo gallery in Memories.  Content saved in Memories is backed up by Snap and may remain in Memories until deleted by the user.  Users may encrypt their content in Memories (called "My Eyes Only"), in which case the content is not accessible to Snap and cannot be decrypted by Snap.

d)      Chat: A user can type messages, send Snaps, audio notes, and video notes to friends within the Snapchat app using the Chat feature.  Our servers are designed to automatically delete one-to-one chats once the recipient has opened the message and both the sender and recipient have left the chat screen, depending on the user's chat settings.  Snap's servers are designed to automatically delete unopened one-to-one chats in 30 days.  Users can also chat in groups.  Chats sent in groups are deleted after 24 hours whether they are opened or not.  A user can save a message in Chat by pressing and holding the message.  The user can unsave the message by pressing and holding it again. This will delete it from our servers.  Users can also delete chats that they have sent to a recipient before the recipient has opened the chat or after the recipient has saved the chat.

e)      Location Data: If a user has device-level location services turned on and has opted into location services on Snapchat, Snap will collect location data at various points during the user's use of Snapchat, and retention periods for location data vary depending on the

purpose of the collection.  Users have some control over the deletion of their location data in the app settings.

28.     In some cases, users of social networking applications will communicate directly with the application about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Application providers typically retain records about such communications, including records of contacts between the user and the providers support services, as well as records of any actions taken by the provider or user as a result of the communications.  In addition, application providers often have records of the IP addresses used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help identify which computers or other devices were used to access the account and their geographic location.

29.     As explained herein, information stored in connection with a Snapchat account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, data retained by Snap can indicate who has used or controlled the Snapchat account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  Additionally, location information retained by Snap may tend to either inculpate or exculpate the Snapchat account owner.  Last, Snapchat account activity may provide relevant insight into the account owner's state of mind as it relates to the offense under investigation.  For example, information on the Snapchat account may indicate the owner's motive

and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

30.     In my training and experience, evidence of who was using an application account may be found in address books, contact or buddy lists, email addresses in the account, and attachments to electronic messages, including pictures and files.

31.     Therefore, the servers of Snap are likely to contain all the material described above, including stored electronic communications and other account information.

## **INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

32.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Snap to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## **CONCLUSION**

33.     Probable cause exists to believe that federal criminal laws, including matters involving violations of 18 U.S.C. §§ 2251 and 2252A (which make it illegal to produce, distribute, and possess child pornography in interstate commerce) and of 18 U.S.C. § 2423 (which makes it illegal to travel in interstate commerce with the intent to engage in illicit sexual activity) have been violated and that the contraband, property, evidence, fruits and instrumentalities of these offenses, more fully described in Attachment B, are located at the location described in Attachment A.

34.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of the warrant.  The government will execute the warrant by serving it on Snapchat.  Because the warrants will be served on Snapchat, who will then compile the requested records at a time convenient to them, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

35.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).